Alexander Shalom
Jeanne LoCicero
Elyla Huertas
Katherine Haas
AMERICAN CIVIL LIBERTIES UNION
OF NEW JERSEY FOUNDATION
570 Broad Street, 11th Floor
P.O. Box 32159
Newark, New Jersey 07102
(973) 854-1714

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____

JOHN Q. (a pseudonym),

               Plaintiff,

    v.

MONMOUTH COUNTY,

               Defendant.

_____

Civil Action No.:

Hon. _____

**JURY TRIAL DEMANDED**

## COMPLAINT

1.     This action seeks relief for Mr. John Q., a United States citizen and former refugee who has lived in the United States for nearly three decades. Monmouth County detained Mr. Q for immigration enforcement purposes, without probable cause, on the basis of false and discriminatory assumptions about his immigration status. Mr. Q now seeks compensation for his unlawful loss of liberty, and accountability for the people and entities who caused it.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this Complaint under the Fourth and Fourteenth Amendments to the United States Constitution and 28 U.S.C. § 1331 (federal question), § 1343 (civil rights), and § 1367 (supplemental jurisdiction).

3.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the acts at issue in this lawsuit occurred within the District.

## PARTIES

4.      Plaintiff is and was at all times relevant to this Complaint a resident of Pennsylvania and a United States citizen.

5.      Defendant Monmouth County is a political subdivision of the State of New Jersey that can sue and be sued in its own name. Defendant Monmouth County includes, operates, and is responsible for the Monmouth County Sheriff's Office (MCSO) and Monmouth County Correctional Institution (MCCI).

## FACTUAL ALLEGATIONS

### Monmouth County's Immigration Enforcement Activities

6.      Although immigration enforcement is a matter of federal rather than state or local law, United States Immigration and Customs Enforcement (ICE) often relies on state and local law enforcement entities in order to apprehend and detain people that it suspects should be removed from the United States.

7.      ICE routinely issues "immigration detainers," which are requests that state and local law enforcement agencies hold people in their custody for up to 48 hours after there is no longer any state-law basis to hold them, so that ICE may investigate and potentially assume custody over them.

8.     Immigration detainers are deeply flawed tools that often result in detention without probable cause and other violations of individuals' constitutional rights. One problem that arises frequently is the issuance of immigration detainers against United States citizens who, due to their status as citizens, ICE has no legal authority to detain or ask others to detain. According to an analysis performed by Transactional Records Access Clearinghouse (TRAC) – an organization at Syracuse University that gathers and distributes immigration enforcement data – ICE's own records reflect that 3,158 detainers were issued against United States citizens between 2002 and 2019. Other reports suggest much higher numbers. For example, the CATO Institute estimates that between 2006 and 2017, ICE may have wrongfully targeted roughly 19,873 U.S. citizens nationwide with immigration detainers. More localized research has also revealed startling numbers. One report found that ICE issued 420 detainers for people listed as United States citizens in Miami-Dade County in a two year period, 462 detainers for people listed as U.S. citizens in Rhode Island over a ten year period, and 814 detainers for people listed as U.S. citizens in Travis County, Texas over a similar period.

9.     Various U.S. citizens who have been wrongfully held on immigration detainers have sued, leading to published judicial decisions and high-profile press coverage. *See, e.g.*, *Morales v. Chadbourne*, 793 F.3d 208 (1st Cir. 2015); *Galarza v. Szalczyk*, 745 F.3d 634 (3d Cir. 2014). Many local law enforcement agencies, Sheriff's associations, and other organizations affiliated with local law enforcement routinely share and receive updates about such litigation. It is likely that Monmouth County received information about such litigation through similar means before the events at issue in this case.

10.     Many immigration detainer requests are sent to Monmouth County. According to records obtained by TRAC, nearly 3,000 immigration detainers were issued to the MCCI between 2003 and 2019.

11.     Local law enforcement entities are not required to hold someone simply because immigration authorities request that they do so by issuing a detainer. *See Galarza v. Szalczyk*, 745 F.3d 634 (3d Cir. 2014) (holding that counties cannot use existence of a detainer as defense to constitutional claims arising from county's decision to extend plaintiff's detention). After the Third Circuit made this clear in 2014, the American Civil Liberties Union of New Jersey sent a letter to Monmouth County, explaining the optional nature of immigration detainers. The letter also explained the serious constitutional concerns raised by immigration detainers, and warned the county that it could be liable for any constitutional violations that resulted from choosing to comply with detainer requests lodged against U.S. citizens. Nonetheless, the MCCI continued to hold numerous people for immigration enforcement purposes after they would otherwise be released.

12.     Data gathered and analyzed by TRAC shows in fiscal years 2017, 2018, and 2019 – a period which includes all events surrounding Mr. Q's unlawful detention – MCCI did not deny a single one of the hundreds of detainer requests it received.

13.     At the times relevant to this complaint, Monmouth County had a policy, practice, and custom of indiscriminately complying with all requests from immigration enforcement authorities to hold people after state-law authority to hold them expired, even where the County possessed or could easily obtain evidence that the person could not lawfully be subjected to immigration enforcement at all.

14.     In addition to issuing detainers, ICE sometimes signs "287(g) agreements" that deputize state and local officers to perform limited immigration enforcement activities.

15.     Monmouth County had such an agreement with ICE beginning in 2010. The county's decision to maintain such an agreement with ICE was an outlier in New Jersey. In September 2019, when New Jersey Attorney General Gurbir S. Grewal ordered that all 287(g) agreements must be terminated due to concerns about their impact on the effectiveness of state and local law enforcement, Monmouth was one of only two counties that had one. Under the agreement, certain correctional officers were permitted to engage in activities on ICE's behalf such as interrogating people detained at the MCCI about their right to remain in the United States, processing individuals at the MCCI for potential removal, and issuing immigration detainers.

16.     In response to a 2019 records request that sought, among other things, any and all training materials regarding immigration enforcement that were provided to the Monmouth County officers operating under the 287(g) agreement, Monmouth County indicated that it had none. Although ICE provided limited training and supervision to the few Monmouth officers operating under the 287(g) agreement, at the times relevant to this complaint Monmouth County did not provide training or supervision to its entire force of correctional officers that was adequate to ensure the County's immigration enforcement activities would not violate individuals' constitutional rights.

### Mr. Q's Arrest and Detention

17.     Mr. Q was born in Moscow, Russia in 1971. He came to the United States as a refugee in 1990, at the age of 18. In 2004, Mr. Q became a naturalized United States citizen.

18.     Mr. Q was arrested in the early morning of July 28, 2018, in Hazlet, New Jersey. He was charged with a disorderly persons offense, which was ultimately dismissed. Following his arrest, he was taken to the Hazlet Township Police Department for booking and fingerprinting.

19.     While at the Hazlet Township Police Department, he was asked whether he was a United States citizen, to which he replied that he was.

20.     Mr. Q was then transferred to the MCCI where he completed the facility's admissions process and was detained while awaiting his first appearance.

21.     At several points in the admissions process, Mr. Q was questioned about his citizenship status—he believes due to his distinct accent—and each time he made clear that he was a U.S. citizen.

22.     Mr. Q remained in his cell until approximately noon on July 28, 2018, at which time he had an interview with a paralegal from the Monmouth County office of the New Jersey Office of the Public Defender.

23.     The paralegal asked Mr. Q if he was a citizen and whether he needed an interpreter. Mr. Q informed the paralegal that he was a U.S. citizen and did not need an interpreter.

24.     Shortly thereafter, Mr. Q appeared before a judge for his initial appearance. The judge ordered him released on his own recognizance.

25.     At the conclusion of the appearance, Mr. Q was informed by both the judge and his defense attorney that he would be released shortly thereafter.

26.     Mr. Q was then provided with a copy of the Complaint for his case as well as a notice for his next court appearance. Mr. Q was then taken back to his cell without explanation and placed in what he was later told to be "23/1 lockdown." This meant that he was required to

remain in his cell for 23 hours per day, and would only be allowed to exit for one hour of out-of-cell time.

27.     After the judge ordered Mr. Q to be released on his own recognizance, Monmouth County no longer had any legal authority to detain Mr. Q on the basis of his July 28 arrest for an alleged violation of state law. Continuing to hold Mr. Q after this point constituted a new arrest for a new purpose, which was made without probable cause.

28.     Several hours after he was returned to his cell following his initial appearance, Mr. Q asked a correctional officer when he would be released. The officer responded that he would have to wait until his next hearing date – more than a week in the future – on August 6, 2018.

29.     While Mr. Q was trying to get answers from his jail cell regarding his continued detention, his family members and friends were simultaneously working to secure his release. Shortly after his initial appearance, Mr. Q's friend, an attorney, called the MCCI and was told that Mr. Q was being held for immigration purposes. In an attempt to facilitate Mr. Q's release, his friend then went to the MCCI with Mr. Q's U.S. passport.

30.     When Mr. Q's attorney friend arrived at the MCCI, he picked up the phone that visitors are directed to use when arriving at the facility and explained to the MCCI official who answered that he was trying to present Mr. Q's passport to prove his U.S. citizenship status. At that time, the official on the phone told Mr. Q's friend that "this is not how things work here."

31.     Mr. Q's friend was further informed that Mr. Q could not be released until Monday, two days later.

32.     Later that evening, Mr. Q's wife, mother, and cousin drove to the MCCI in another effort to inform Monmouth County of Mr. Q's citizenship. They remained at the facility for several

hours in an attempt to convince officials to consider Mr. Q's passport, but finally gave up for the night around 11 p.m.

33.     Despite having been ordered released, Mr. Q remained in jail overnight.

34.     The following morning, when Mr. Q was finally allowed to leave his cell for his one hour of recreational time, he attempted to talk to two different corrections officers about his immigration status. The first officer rebuffed Mr. Q, informing him that he would have to wait. Mr. Q then showed a second corrections officer the paperwork he had received following his initial appearance. The second officer finally agreed to look into why Mr. Q was still in jail. After checking, the officer told Mr. Q that there was an immigration detainer in place, and that was why he remained at the MCCI. Mr. Q explained to the officer that he was a U.S. citizen and he was again told that he would have to wait.

35.     Mr. Q. was then allowed to make a phone call at which time he called his attorney friend. His friend confirmed that he was indeed being held for immigration purposes and that his family was trying to get him released.

36.     That morning, Mr. Q's family and his attorney friend again appeared at the MCCI in an attempt to present his United States passport. Monmouth County again refused to release him.

37.     The family then contacted an immigration attorney, who called the jail around 11 a.m. on July 29, 2018—the day following the initial appearance—threatening to file suit if Mr. Q was not immediately released.

38.     After this threat of suit, MCCI officials released Mr. Q.

39. Mr. Q was finally given a "hall pass" at 11:30 a.m. and told that would be allowed to leave the facility. After changing his clothes, he was then provided with a Pretrial Release Order, dated the previous day, stating that he had been "released on his/her own recognizance."

40. Mr. Q left the MCCI shortly after noon on July 29, 2018.

41. The criminal charges originally filed against Mr. Q were dismissed by the Municipal Court and the record of his arrest was thereafter expunged pursuant to a New Jersey statute that allows for the automatic expungement of arrests that do not result in a conviction. N.J.S.A. 2C:52-6.

**Monmouth County Officials Detained Mr. Q without Probable Cause or Other Legal Authority for Discriminatory Reasons**

42. After a judge ordered Mr. Q's release, Mr. Q remained in Monmouth County's custody for nearly 24 hours, including an overnight stay.

43. Monmouth County officials made clear to Mr. Q, his family, and his friend that the reason he remained in custody after a criminal judge had ordered him released was for civil immigration enforcement purposes.

44. Mr. Q's citizenship was and should have been clear to MCCI officials. Not only did Mr. Q, his friend, and his family advise MCCI officials of this fact several times and even offered to provide conclusive evidence in the form of his United States passport, but the MCCI's own booking sheet for Mr. Q explicitly stated that he was a United States citizen, and also listed his social security number and driver's license number.

45. Moreover, due to Monmouth County's 287(g) agreement with ICE, several MCCI officers had access to federal immigration information. Monmouth County officials could quickly and easily have confirmed Mr. Q's citizenship.

46.     When MCCI officials unlawfully detained Mr. Q for immigration-enforcement purposes, in spite of the plentiful evidence that he was a United States citizen who could not be legally held for such purposes, they discriminated against him on the basis of his national origin.

**Defendant's Actions Unlawfully Harmed Plaintiff**

47.     As a direct and proximate result of the conduct of Monmouth County, Plaintiff suffered substantial damages, including emotional distress and harm, embarrassment, and lost liberty.

**CAUSES OF ACTION**

**Count I**

**Violation of the Fourth and Fourteenth Amendments of the United States Constitution**
**(42 U.S.C. § 1983)**
**(Unreasonable Seizure)**

48.     Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

49.     The Fourth Amendment to the United States Constitution prohibits unreasonable seizures, and an arrest made without probable cause is unreasonable. Through the Fourteenth Amendment, the Fourth Amendment's prohibition on unreasonable seizures applies to state and local officers, including those of Monmouth County.

50.     Continuing to detain Mr. Q for immigration enforcement purposes after a judge ordered his release, and thus after any state-law basis for his detention expired, constituted a new arrest and seizure of Mr. Q by Monmouth County officers. The County made this seizure without probable cause to believe that Mr. Q. was subject to removal.

51.     United States citizens cannot lawfully be subjected to immigration enforcement, including detention for immigration enforcement purposes. Monmouth County officers possessed

or had easy access to evidence demonstrating that Mr. Q was a United States citizen, and were repeatedly informed of this fact by Mr. Q himself, as well as his friend and his family. Nonetheless, they continued to detain him for immigration enforcement purposes after the state-law basis for his detention expired. This constituted an unreasonable seizure in violation of the Fourth and Fourteenth Amendments.

52.     In effectuating this unreasonable seizure, Monmouth County officers were acting under color of state law.

53.     This unreasonable seizure was caused by Monmouth County's policy, practice, and custom of indiscriminately complying with all requests from immigration enforcement authorities to hold people after state-law authority to hold them expires, even where the County possesses or could easily obtain evidence that they cannot lawfully be subjected to immigration enforcement at all.

54.     This unreasonable seizure was also caused by Monmouth County's failure to provide training or supervision to its correctional officers that is adequate to ensure the County's immigration enforcement activities will not violate individuals' constitutional rights.

55.     This failure to adequately train and supervise resulted from the deliberate indifference of Monmouth County policymakers to the risk of violations of the constitutional rights of those in Monmouth County's custody like that to which Mr. Q was subjected. Monmouth County policymakers were on notice of the danger that their acts and omissions would result in a U.S. Citizen like Mr. Q being unconstitutionally held for immigration purposes.

56.     Because of Monmouth County's extensive involvement in immigration enforcement activities, it is obvious that its officers need to be thoroughly trained and closely supervised as to how to engage in those activities without violating constitutional rights.

57.     As a result of his unreasonable seizure, Mr. Q suffered severe emotional harm and the unlawful loss of his liberty.

## Count II

### Violation of the New Jersey Law Against Discrimination
### (Discrimination on the Basis of National Origin)

58.     Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

59.     The actions of Defendant violated the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to 14.1, which provides:

> All persons shall have the opportunity to obtain employment, and to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation, publicly assisted housing accommodation, and other real property without discrimination because of race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, familial status, disability, nationality, sex, gender identity or expression or source of lawful income used for rental or mortgage payments, subject only to conditions and limitations applicable alike to all persons. This opportunity is recognized as and declared to be a civil right.

60.     The New Jersey Law Against Discrimination thus mandates that all persons shall have the opportunity to obtain all the privileges of any place of public accommodation without discrimination because of national origin.

61.     County jails, including the MCCI, are places of public accommodation under the New Jersey Law Against Discrimination, N.J.S.A. § 10:5-1 to 14.1.

62.     By refusing to promptly release Mr. Q after he was ordered released by a judge, and instead continuing to detain him for immigration enforcement purposes in the face of evidence that he was a United States citizen, Monmouth County denied Mr. Q the privilege of honoring the state court release order.

63.     Monmouth County denied Mr. Q this privilege because of his national origin.

64.     Pursuant to 28 U.S.C. § 1367, this Court has pendant or supplemental jurisdiction to hear and adjudicate such claims.

## Count III

### Violation of Article 1, Paragraph 7 of the New Jersey Constitution
### (Directly and Pursuant to N.J.S.A. 10:6-1 et seq.)

65.     Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

66.     Article 1, Paragraph 7 of the New Jersey Constitution, like the Fourth Amendment to the United States Constitution, protects against unreasonable seizures. However, Article 1, Paragraph 7 of the New Jersey Constitution is more protective of individuals' rights than the Fourth Amendment, and New Jersey courts treat federal Fourth Amendment law as a floor, rather than a ceiling, to their interpretation of the rights provided by Article 1, Paragraph 7. *See*, *e.g.*, *State v. Hempele*, 120 N.J. 182, 197 (1990).

67.     By detaining Mr. Q for immigration enforcement purposes after he was ordered released on his own recognizance, Monmouth County officers unreasonably seized Plaintiff in violation of Article 1, Paragraph 7 of the New Jersey Constitution.

68.     In effectuating this unreasonable seizure, Monmouth County officers acted under color of state law.

69.     As a result of this unreasonable seizure, Mr. Q suffered severe emotional harm and the unlawful loss of his liberty.

70.     Pursuant to 28 U.S.C. § 1367, this Court has pendant or supplemental jurisdiction to hear and adjudicate such claims.

## PRAYER FOR RELIEF

Wherefore, Mr. Q respectfully asks the Court to:

1.       Award Mr. Q appropriate compensatory damages;

2.       Award Mr. Q reasonable attorney's fees and costs, as provided by statute and law;

3.       Declare that Defendant violated Mr. Q's rights under the United States and New Jersey Constitutions.

4.       Declare, pursuant to N.J.S.A. 10:5-13, that Defendant discriminated against Mr. Q in violation of law; and

5.       Grant any such other relief as the Court finds just and proper.


## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury.


Dated:  July 27, 2020                                    AMERICAN CIVIL LIBERTIES
                                                        UNION OF NEW JERSEY
                                                        FOUNDATION


                                                        BY: s/ Alexander Shalom
                                                        Alexander Shalom
                                                        Jeanne LoCicero
                                                        Elyla Huertas
                                                        Katherine Haas
                                                        P.O. Box 32159
                                                        Newark, New Jersey 07102
                                                        (973) 854-1714
                                                        *Attorneys for Plaintiff*

14

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Counsel for Plaintiff have filed an administrative claim under the Federal Tort Claims Act regarding this matter on Plaintiff's behalf. The matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding. I certify under penalty of perjury that the foregoing is true and correct.

Dated:  July 27, 2020

AMERICAN CIVIL LIBERTIES
UNION OF NEW JERSEY
FOUNDATION


BY: s/ Alexander Shalom
Alexander Shalom
Jeanne LoCicero
Elyla Huertas
Katherine Haas
P.O. Box 32159
Newark, New Jersey 07102
(973) 854-1714